**Ralph CHAMBERS, Appellant,**

v.

**The STATE of Texas, Appellee.**

**No. 14–81–219–CR.**

Court of Appeals of Texas, Houston (14th Dist.).

Feb. 18, 1982.

Will Gray, Simonton, for appellant.

John B. Holmes, Jr., Dist. Atty., Houston, for appellee.

Before MILLER, MORSE and JAMES, JJ.

MORSE, Justice.

This is an appeal from a conviction of burglary of a building, with intent to commit theft. On trial to a jury, appellant was found guilty and sentenced by the trial court to ten years confinement at the Texas Department of Corrections. Having found no error, we affirm the judgment of the trial court.

On July 11, 1978, Arnulfo ("Al") Heath was on trial for delivery of cocaine and was represented by the appellant, Ralph Chambers. The trial took place in the 176th District Court of Harris County, Texas, and was presided over by Judge William Hatten. During the Heath trial, 12 small bags and 2 larger bags of cocaine were admitted into evidence. At the end of the day, this evidence was placed in a box and put on top of a file cabinet in the court reporter's office.

Heath, the State's key witness and an accomplice as a matter of law, testified that he and Chambers remained in the judge's office for about 15 minutes working on the charge in Heath's case after everybody else had left. This was late afternoon on July 11. When they left the Courthouse, they went across the street to a bar where they had a few drinks. At this time they discussed the cocaine which had been offered into evidence during Heath's trial, and the prospects of getting it back. After Chambers had made several phone calls, Heath and Chambers left the bar at about 9 p. m. and went to the Time Out Club. Chambers called Lannie Phillips, a former investigator with the Harris County District Attorney's office who had keys to various offices in the Courthouse, supposedly including the 176th District Court offices. Phillips arrived approximately 25 minutes later with 8 to 10 keys. Chambers then took his briefcase and the keys that Phillips had brought and left

for the Courthouse. He returned in about 20 minutes, threw the keys on the table and said they wouldn't work and that he needed a burglar tool. Next, they went out to Phillips' car and took out a tire tool. Chambers put the tire tool under his shirt and had Heath and Phillips drop him off at the Courthouse and ride around for 15 to 20 minutes while he went in. A short time later, Heath saw Chambers come out of the elevator inside the Courthouse. Chambers was not carrying his briefcase and was "hunched over" holding something. Chambers came straight to the car, sat down and took several packages of cocaine out of his shirt. The three men then went to the Rotary Table for another drink and parked in the back. It was decided that Phillips would take the cocaine, since he knew somebody whom he could trust to keep it. Phillips left in his car and Heath and Chambers remained at the Rotary Table until about 2 a. m. at which time the bar owner's brother gave them a ride home.

Chambers arrived at the Courthouse early the next morning and went through the file cabinets and the desk in the court reporter's office as though he was looking for his brief case. Heath testified that Chambers had informed him the next morning that he had taken "the opportunity to go through the file cabinets and the desk like he was looking for his briefcase so he would leave fingerprints."

According to the testimony of Billy Wuneburger, another witness for the State, Phillips approached him between 9 P.M. and 11 P.M. on the night of July 11, after the burglary, and asked him to hold the cocaine. Wuneburger held the cocaine for several weeks, delivering small amounts to Phillips on several occasions, and returning the remainder of the cocaine to Phillips on August 4th.

State's witness Ronnie Stewart testified that Chambers telephoned him at about 7 p. m. on the night of the burglary. Chambers told Stewart that he knew where they could "make a score" and it consisted of going to the Courthouse and stealing four and a half pounds of cocaine. Stewart told Chambers that he would assist, but Chambers never called him back. Stewart had been sick that evening and at about 1 a. m. the following morning his fever went up to 104 and he checked into a hospital. Four or five days after the burglary, Chambers gave him 6 oz. of cocaine in repayment of a debt. Stewart diluted this cocaine to the point that it was not marketable and therefore, returned it to Chambers in order that it could be mixed with the remainder of the cocaine to increase its strength. The court allowed the jury to determine whether Stewart and Wuneburger were in fact accomplices, as defined in the charge, and if so found, the court instructed the jury as to the requirement of corroboration by other evidence other than the testimony of Heath, Stewart, or Wuneburger.

Heath also testified that he was with Chambers on August 4, when Phillips came in and gave Chambers a small ice chest containing what was weighed as 33 or 34 oz. of cocaine, which was "way short" of what was supposed to be returned. In addition Heath testified that he went with Chambers to a meeting with Ronnie Stewart and Beau Deal at the Los Comales Restaurant on August 16. At the meeting, Stewart was upset and told Chambers that he wanted his 6 oz. of cocaine or his money back. Chambers wrote Wuneburger's address down on a piece of paper later introduced as an exhibit. Heath said "..it was agreed" that he, Stewart and Deal would go to Wuneburger's apartment and talk to him about the cocaine. The three went to the apartment with guns, but didn't find Wuneburger. Later that same day, Stewart was arrested at the Rusty Bucket for carrying a pistol. About a week after Stewart's arrest, Chambers came to Heath's house and brought some cocaine for Heath to either hide or sell, whichever he could do. Heath then gave the cocaine to a lady he trusted who was visiting him from San Antonio. She agreed to keep the package for him and returned to San Antonio the following day. The next day Chambers wanted the cocaine back and Heath told him that he had already given it to somebody in Brownsville. Heath, whose bond

had been raised to $100,000 after Stewart had "spilled his guts" to the District Attorney's office, was arrested the following day. A few days after his arrest, Heath agreed to cooperate with the police and a meeting was arranged between Heath and Chambers. When Chambers arrived, they met in a detective's office and discussed the bond situation. During the meeting, Chambers made motions with his hands and whispered for Heath to return the cocaine. According to Heath, Chambers whispered because he knew the office was bugged. Chambers left the office with the understanding that Mrs. Heath would call him when the cocaine was ready to be picked up.

According to the testimony of detective Carpenter of the Houston Police Department, he and Heath flew to San Antonio (the day before Heath's meeting with Chambers) and picked up the cocaine which Heath had given to his friend to hold. They returned to Houston, and the following day, after Heath had met with Chambers, Heath and Detective Carpenter went to Heath's residence and placed the cocaine beside a tree. Mrs. Heath telephoned Chambers and he arrived shortly thereafter. Chambers picked up the package containing the cocaine from under the tree and drove off in his car. A short distance down the road he was apprehended by the Houston Police and arrested. The cocaine in the package was the same (Heath said) which Chambers had earlier delivered to him and that Heath had given to the woman in San Antonio. A forensic chemist for the drug enforcement administration testified that the cocaine recovered from Chambers was chemically similar to the cocaine which was admitted into evidence at the Heath trial.

Appellant comes before this court with two points of error. In his first point he contends that the evidence presented at trial was insufficient to corroborate the testimony of the accomplice witnesses.

█ The State's key witness, Heath, being an accomplice witness as a matter of law, his testimony must be corroborated by other evidence tending to connect the defendant to the offense committed. Tex.

Code Crim.Pro.Ann. Art. 38.14 (Vernon 1979). The mere showing that an offense occurred is not sufficient corroboration. *Windham v. State*, 479 S.W.2d 319 (Tex.Cr. App.1972). However, it is not necessary that the corroboration directly link the accused to the crime or be sufficient in itself to establish his guilt. *Attwood v. State*, 509 S.W.2d 342 (Tex.Cr.App.1974). The corroborating evidence need only make the accomplice's testimony more likely than not. *Warren v. State*, 514 S.W.2d 458 (Tex.Cr. App.1974). In *Edwards v. State*, 427 S.W.2d 629 (Tex.Cr.App.1968), the Court of Criminal Appeals laid down the following rule:

> The test as to the sufficiency of the corroboration is to eliminate from consideration the evidence of the accomplice witness and then to examine the evidence of other witnesses with the view to ascertain if there be inculpatory evidence, that is evidence of incriminating character which tends to connect the defendant with the commission of the offense. If there is such evidence, the corroboration is sufficient, otherwise it is not.

*See Carrillo v. State*, 591 S.W.2d 876 (Tex. Cr.App.1979); *Rice v. State*, 587 S.W.2d 689 (Tex.Cr.App.1979).

In the instant case, if we omit the testimony of the accomplice witnesses, there is still testimony by independent witnesses which places Chambers with Heath both before and after the time at which the building was allegedly burglarized. It was established by the testimony of Judge Hatten that Chambers did go through the court reporter's office searching for his briefcase on the morning following the burglary. This fact lends credibility to Heath's testimony that Chambers went looking for his briefcase the following morning "...so he would leave fingerprints." Since Heath arrived at the Courthouse after Chambers, Heath possibly would not have known about Chambers looking for his briefcase unless he was later told about it by Chambers. Also, the State presented the testimony of John Bright, a detective with the Harris County Sheriff's Department, who

had investigated the scene of the burglary. Detective Bright testified that entrance into the court reporter's office had "apparently been made by using a screw driver or a tire tool type instrument placed between the door and the jamb and then pried outward to break the knob." This is consistent with Heath's testimony that, after the keys did not work, Chambers returned to the bar and obtained a tire tool to use in the burglary of the court reporter's office. Furthermore, the State offered into evidence a telephone call back slip written by appellant's secretary for him on July 10, which had the names Ralph Chambers and Isaac Escamilla, the owner of Los Comales Restaurant, on it. This call back slip had been found on July 12 by detectives at the base of some filing cabinets which were located in the hallway across from the door to the court reporter's office. Finally, when Chambers was apprehended by the Houston Police he was in possession of the cocaine which he had picked up from under the tree at Heath's house. According to Heath, this was the same cocaine which had been stolen from the court reporter's office, and the State's chemist witness established that said cocaine was similar to that taken in the Courthouse burglary. Although Chambers testified he thought that the package contained money and that he did not know that it contained cocaine, the jury was free to disregard this explanation as unbelievable.

Corroborating evidence is also found in the testimony of Beau Deal, a State's witness who had accompanied Ronnie Stewart to the meeting at the Los Comales Restaurant on August 16, 1978. In summarizing a conversation between Ralph Chambers and Ronnie Stewart which took place at the meeting, Beau Deal testified:

Ronnie said, well, this is a damn mess, you know. He said you shouldn't be handling my money—stuff to anybody else that you should have taken care of it. He said you'll be taken care of anyway. You'll be straightened out on the deal. You'll get your money back or your stuff and he said, yeah, but you shouldn't have done it and he says if this damn thing had went right you would have given me

the key. He said I should have went and got it and this is the time that it came out that this was the courthouse burglary and Ralph informed him, he said, well, you were sick and Ronnie says, yeah, I was laying up sick. He said I had a 104 or five fever or something, he said, at the time and Ralph said, I had the key and it had to be done right then and he said you wouldn't have known how to get in and out of it anyway.

It is not contended on appeal that Deal was an accomplice witness. Deal was an old friend of Stewart and had been told by Stewart that they were going to the Los Comales Restaurant "to meet someone and pick up some money." Although Deal was present during a discussion of the Courthouse burglary and went with Heath and Stewart to Wuneburger's apartment to try to recover some of the cocaine, it is well established that a witness is not deemed an "accomplice witness" because he knew of a crime but failed to disclose or even concealed it. *Carrillo v. State, supra.* A witness is not an accomplice witness unless he could be convicted of the crime sought to be proved. *Villarreal v. State,* 576 S.W.2d 51 (Tex.Cr.App.1978); *Ferguson v. State,* 573 S.W.2d 516 (Tex.Cr.App.1978); *Matter of M. L.,* 602 S.W.2d 550 (Tex.Civ.App.—Corpus Christi 1980, no writ).

Although none of these threads of evidence would be sufficient to establish guilt independently, we feel that when they are considered together, they are clearly sufficient to support the accomplice testimony relied upon by the State. Appellant's first ground of error is overruled.

In the second point of error the appellant alleges that there is a fatal variance between the allegation that the burglarized building was owned by William M. Hatten and the proof that the building was the County Courthouse and the burglarized office was that of the court reporter. Appellant argues that the burglarized office was in the care, custody and control of the court reporter and therefore, that the allegations of ownership should have been that of the

court reporter. In the alternative, appellant argues that the testimony of the State's own witness, the building supervisor, Mr. Henry Pitman, placed control of the burglarized building in Mr. Pitman which clearly refuted the allegation that Judge Hatten was the "owner."

"Owner" as defined in the Tex.Penal Code Ann. § 1.07(a)(24) (Vernon 1974), means a person "who has title to the property, possession of the property, whether lawful or not, or a greater right to possession of the property than the actor." It is well established in Texas that in a burglary prosecution, it is not required that the sole and unconditional ownership either of the building or of the property therein shall be in the name of the person alleged to be the owner. *Franks v. State*, 129 Tex.Cr.R. 91, 83 S.W.2d 980 (1935). The definition of "owner" as provided by the Texas Penal Code is designed to protect all ownership interests in property from criminal behavior. "Owner" was defined by the legislature to protect those persons who had a greater right to possession of the property than the criminal actor. *Ex Parte Davis*, 542 S.W.2d 192 (Tex.Cr.App.1976); *see Ellett v. State*, 607 S.W.2d 545 (Tex.Cr.App. 1980). The indictment in this case alleged ownership to Judge William Hatten. Judge Hatten testified that he had care, custody, control and management of the premises used by the 176th District Court and that the said premises were locked at night and nobody had permission to enter those offices. There is no doubt that as to occasion of entry by appellant Judge Hatten qualifies as "owner" as defined by § 1.07(a)(24). Appellant's second point of error is overruled. The judgment of the trial court is affirmed.